**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

United States District Court
Southern District of New York

7:19-cv-11224

| | |
|---|---|
| Constance Fore-Heron, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| - against - | Class Action Complaint |
| The Price Chopper, Inc., | |
| Defendant | |

Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

1.     The Price Chopper, Inc. ("defendant") manufactures, distributes, markets, labels and sells almondmilk beverages purporting to be characterized by and containing flavor only from vanilla under their  brand ("Products").

2.     The Products are available to consumers from defendant's retail stores and are sold in sizes including cartons of .5 gallon (64 FL OZ).

3.     The Product's front label and advertising makes direct representations with respect to its primary recognizable and characterizing flavor by the word Vanilla.[1]

_____

[1] 21 C.F.R. § 101.22(i).



4.    The back panel includes the Nutrition Facts and ingredient list.



**INGREDIENTS: ALMONDMILK (FILTERED WATER, ALMONDS), CALCIUM CARBONATE, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, POTASSIUM CITRATE, SUNFLOWER LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E).**

I.   Increase in Consumption of Non-Dairy, Plant-Based Milks

5.     The past decade has seen a proliferation of plant-based or non-dairy "milks" made from various agricultural commodities.

6.     The two most popular types of "plant milk" are made from soybeans and almonds.

7.     Reasons for choosing soymilk include tree nut allergies, creamier consistency, a natural source of soy protein and more B vitamins, magnesium and potassium.[2]

8.     Reasons for choosing almondmilk include soy allergies, sweeter taste, similar consistency to skim and low-fat milk, nutty flavor and higher levels of vitamin E.

9.     Recent studies indicate that of the 7.2 million U.S. adults with food allergies, 3 million are allergic to tree nuts (including almonds) while 1.5 million are allergic to soy.[3]

10.    Whether due to few people being allergic to both soy and almonds or their different qualities, consumers seldom switch between the two.

11.    These plant-based beverages are often mixed with a flavoring like vanilla or chocolate to increase palatability and are either sweetened or unsweetened.

II.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

12.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles extractable from one-unit weight of vanilla beans."[4]

13.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[5]

---

[2]   Yahoo Food, Almond Milk Vs. Soy Milk: Which Is Better?, September 5, 2014.
[3]   Ruchi Gupta et al., "Prevalence and severity of food allergies among US adults," JAMA network open 2, no. 1 (2019): e185630-e185630.
[4]   21 C.F.R. §169.3(c).
[5]   Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

14.     Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[6]

15.     It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[7]

16.     This demand could not be met by natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

17.     Today, headlines tell of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[8]

18.     Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.   Food Fraud as Applied to Vanilla

19.     Vanilla is a "high-risk [for food fraud product] because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of

---

[6] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[7] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein, "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[8] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?. Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

quality and value of vanilla flavorings," second only to saffron in price.[9]

20.   The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[10]

| Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[11]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better resemble the hue of rich, yellow butter |
| ➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality | • Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use<br>• Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception |
| ➢ Addition of less expensive | • Synthetically produced ethyl vanillin, derived from |

[9] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[10] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[11] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

| | |
|---|---|
| substitute ingredient to mimic flavor of more valuable component | recycled paper, tree bark or coal tar, to imitate taste of real vanilla |
| ➢ Compounding, Diluting, Extending | • "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[12]<br><br>• Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[13]<br><br>• "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark |
| ➢ Addition of fillers to give the impression there is more of the product than there actually is | • Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex County. |
| ➢ Ingredient List Deception[14] | • Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list<br>   o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics<br>   o "natural vanilla flavorings" – "-ing" as suffix referring |

---

[12] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.

[13] Berenstein, 423.

[14] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

to something *like* that which is described

o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food; often containing high amount of vanillin, which must be disclosed as an *artificial* flavor when paired with vanilla

o "Flavor Splitting" – separating the components of a "Vanilla WONF" ingredient – vanilla extract or flavoring and "(other) natural flavor" – which gives the appearance the higher quality vanilla ingredient is used by the manufacturer when it is actually a component of a flavor blend

B. <u>The Use of Vanillin to Simulate Vanilla</u>

21.    The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

22.    First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

23.    According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to a full gallon of single-fold vanilla extract."[15]

24.    Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

25.    Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* <u>Kansas State Board of Health, Bulletin, Vol. 7</u>,

---

[15] Katy Severson, <u>Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor</u>, Huffington Post, May 21, 2019.

1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

C.  <u>"Natural Vanillins" are Produced in a Non-Natural Manner</u>

26.    The past ten years have seen the introduction of vanillin ingredients that purport to be a "natural flavor," based on the raw material being a natural source and undergoing a natural production process.

27.    However, the starting material, eugenol, is subjected to high heat and high pressure in conversion to vanillin, which is actually considered by the FDA to be a synthetic method.

28.    These low-cost "natural vanillins" are produced by the ton in China, with little transparency or verification, before being delivered to the flavor companies for blending.

D.  <u>"Vanilla WONF" to Imitate Real Vanilla</u>

29.    The global shortage of vanilla beans has forced the flavor industry to "innovate[ing] natural vanilla solutions…to protect our existing customers."[16]

30.    These "customers" do not include the impoverished vanilla farmers who are at the mercy of global conglomerates nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

31.    The flavor industry has reacted to the high vanilla prices with programs like the "Sustainable Vanilla Initiative" ("SVI") and "Rainforest Alliance Certified."

32.    However, whispered reports among the vanilla farmers of Madagascar have been circulating  that contrary to seeking "sustainability" of vanilla, the food and flavor conglomerates

---

[16] Amanda Del Buono, <u>Ingredient Spotlight</u>, Beverage Industry, Oct. 3, 2016.

are actually working in the opposite direction.

33.     This entails paying vanilla growers to destroy their crops instead of taking the cured beans to market under the guise of "diversifying" their crops to produce palm oil among other already plentiful commodities.

34.     Fewer vanilla beans means higher prices, which benefit the flavor industry because products like vanilla extract have low margins – there is no advanced synthetic biology or proprietary formula for this basic, yet multipurpose ingredient.

35.     While this conclusion is not admitted, it is apparent from comments of industry executives.

36.     According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price."

37.     The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

38.     These compounded flavors typically exist in a "black box" and "consist of as many as 100 or more flavor ingredients," including maltol, piperonal and even "natural vanillin," blended together in a special ratio to complement and enhance the real vanilla component.[17]

39.     A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[18]

---

[17] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

[18] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.

40. That high level executives in the flavor industry are willing to openly boast of their stratagems to give consumers less vanilla for the same price is not unexpected.

41. This is due in part to the once influential and respected trade group for the flavor industry, The Flavor and Extract Manufacturers Association ("FEMA"), abandoning its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

42. Though FEMA previously opposed efforts of industry to deceive consumers, over the past twenty (20) years it has cast the general public to the curb in pursuit of membership dues from its largest members.

### III. The Unqualified Representations as "Vanilla" are Misleading

43. The front label (1) represents the Product's characterizing flavor is vanilla and (2) lacks any qualifying terms, confirming to consumers they contain a sufficient amount of vanilla (flavoring or extract) to independently flavor the Products.

#### A. Product's Ingredient Lists Reveal Non-Vanilla Flavors

44. The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains flavoring other than vanilla, as revealed by "Natural Vanilla Flavor With Other Natural Flavors" on the ingredient list.



INGREDIENTS: ALMONDMILK (FILTERED WATER, ALMONDS), CALCIUM CARBONATE, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, POTASSIUM CITRATE, SUNFLOWER LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E).

**INGREDIENTS:** ALMONDMILK (FILTERED WATER,

ALMONDS), CALCIUM CARBONATE, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, POTASSIUM CITRATE, SUNFLOWER LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E).

B.   Flavoring Ingredients are Typically Combined Prior to Delivery to Manufacturer

45.   When companies use vanilla and non-vanilla flavors in a product, they are typically purchased in one package or container.

46.   Reasons for doing this include: (1) having to manage fewer suppliers, (2) ensuring the vanilla and non-vanilla flavors complement each other, (3) the non-vanilla flavors are intended to resemble, simulate and enhance the vanilla flavor, (4) consistency within product batches the flavor is added to, (5) volatile nature of flavoring constituents, (6) the ability to make misleading representations with respect to a product's flavor and ingredients and (7) ease of use.

47.   When a food manufacturer receives a flavor component from a flavor supplier that consists of two or more natural flavor ingredients, it can be labeled by declaring each ingredient by its  common or usual name such as "strawberry flavor, banana flavor."[19]

48.   Flavorings are not subject to the provisions which allow for the components of an ingredient to be incorporated into the statement of ingredients in order of predominance by weight, such that when "strawberry flavor, banana flavor" is added to a fabricated food, it will be designated as "natural flavor."[20]

49.   "Natural flavor" refers to "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents" from a natural source such as plant material and can refer to

---

[19] 21 C.F.R. § 101.22(g)(2).
[20] See 21 C.F.R. § 101.4(b)(1) ("Spices, flavorings, colorings and chemical preservatives shall be declared according to the provisions of 101.22.") with 21 C.F.R. § 101.22(h)(1) ("The label of a food to which flavor is added shall declare the flavor in the statement of ingredients in the following way: (1) Spice, natural flavor, and artificial flavor may be declared as "spice", "natural flavor", or "artificial flavor", or any combination thereof, as the case may be.")

combinations of natural flavors. *See* 21 C.F.R. § 101.22(a)(3).

IV.    Products Labeled as "Vanilla" Which Contain Vanilla With Other Natural Flavor

50.    The ingredient most commonly used to provide flavors from vanilla and non-vanilla natural sources is known as "Vanilla With Other Natural Flavors" or "Vanilla WONF."[21]

51.    On ingredient lists, this ingredient is often declared inconsistently and in a misleading way: "Natural Vanilla Flavor with Other Natural Flavor," "Natural Vanilla Flavor, Natural Flavor," "Vanilla Extract, Natural Flavor" "Natural Flavor, [INTERVENING INGREDIENTS] Vanilla Extract," instead of the required "Natural Flavor."

52.    Provided a product makes representations as to a characterizing flavor, the type, composition and amount of the flavor(s) used effect how the front label of a product should be designated.  *See* 21 C.F.R. § 101.22(i).

53.    21 C.F.R. § 101.22(i)(1) sets out the requirements for non-misleading flavor designations based on factors including (1) the presence of "natural flavor" and/or "artificial flavor which simulates, resembles or reinforces the characterizing flavor," (2) the presence of artificial flavor which does not simulate the characterizing flavor, (3) whether the natural flavor is obtained from the food ingredient represented as the characterizing flavor – i.e., does the peach flavor come from real peaches or is it synthesized from apricots? and (4) the relative amounts of the different flavor types.  *See* 21 C.F.R. § 101.22(i)(1), 21 C.F.R. § 101.22(i)(2).

54.    The source of flavoring in a food and whether there is a material fact which consumers base their purchasing decisions on.

V.    Why Unqualified "Vanilla" on Front Label is Misleading When Ingredient List Declares

---

[21] 21 C.F.R. § 101.22(i)(1)(iii); 21 C.F.R. § 101.22(i)(1)(i) ("If the food is one that is commonly expected to contain a characterizing food ingredient, e.g., strawberries in "strawberry shortcake", and the food contains natural flavor derived from such ingredient and an amount of characterizing ingredient insufficient to independently characterize the food").

"Natural Vanilla Flavor With Other Natural Flavor"

55.     The front label "Vanilla" gives the impression that all of the flavor (taste sensation and ingredient imparting same) in the Product is contributed from vanilla beans. *See* 21 C.F.R. § 169.3(c) ("The term *unit of vanilla constituent* means the total sapid and odorous principles extractable from one unit weight of vanilla beans").

56.     The front label impression is contradicted by the ingredient list which contains "Natural Vanilla Flavor With Other Natural Flavor" ("Vanilla WONF").

57.     This is because "WONF" flavors are intended to be used where the amount of the named flavor is insufficient to exclusively characterize the food.  *See* 21 C.F.R. § 101.22(i)(1)(iii) (where a "food contains both a characterizing flavor from the product whose flavor is simulated and other natural flavor which simulates, resembles or reinforces the characterizing flavor, the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section and the name of the food shall be immediately followed by the words 'with other natural flavor'").

58.     "[P]aragraph (i)(1)(i)" refers to the requirement that the name of the characterizing flavor be followed by the word "flavored" where a food contains an "amount of characterizing ingredient insufficient to independently characterize the food."  *See* 21 C.F.R. § 101.22(i)(1)(i).

59.     Taken together, where a product contains some vanilla, but not enough to independently characterize the food, and "other natural flavor which simulates, resembles or reinforces the characterizing [vanilla] flavor," a non-misleading description could be "Natural Vanilla Flavored Almondmilk With Other Natural Flavors" or "Vanilla Flavored Almondmilk With Other Natural Flavors." *See* 21 C.F.R. § 101.22(i)(1)(iii).

60.     The absence of the term "flavored" following "Vanilla" on the front label gives consumers the impression that the flavor of the food is contributed mainly from its characterizing food ingredient.

61.    Though a food labeled "vanilla flavored almondmilk" contains real vanilla, the "flavored" term discloses to consumers that such a food (1) contains non-vanilla flavors and (2) does not contain a sufficient amount of vanilla to independently characterize the food.

A.   <u>"Vanilla Flavored With Other Natural Flavor" by Itself Would be Misleading</u>

62.    Even if the front label stated "Vanilla Flavored Almondmilk With Other Natural Flavor" or contained a statement beneath "Almondmilk" such as "Vanilla Flavor With Other Natural Flavor," it would still be misleading.

63.    The vanilla standards do not permit adding non-vanilla, "other natural flavors" to an exclusively vanilla flavor, making it misleading for a product to be labeled on the front as "Vanilla" but only identify the "other natural flavor" in small print on the ingredient list.

64.    Since the exclusively vanilla ingredients are standardized, high-value foods, the term "vanilla" implies the Product contains a full strength vanilla flavoring or vanilla extract, when it actually contains a combination of vanilla and non-vanilla flavors, any name should be accompanied by a statement disclosing the flavoring strength contributed by vanilla and non-vanilla flavors. *See* Exhibit "A," FDA Letter, Quinn to Molina, 1980 ("in order to distinguish this product from other similar products the general principles of 21 CFR 102.5 should apply. Thus, the name should be accompanied by 'contains 50% vanilla extract and 50% non-vanilla flavors.'").

B.   <u>The Presence of Added Vanillin Would Implicate Front Label Designation of Products</u>

65.    The requirements for accurate, non-misleading flavor designation at 21 C.F.R. § 101.22(i)(1)(i)-(iii) are based on the absence of any "artificial flavor which simulates, resembles or reinforces the characterizing flavor." *See* 21 C.F.R. § 101.22(i)(1).

66.    In the context of vanilla, vanillin has always been an "artificial flavor" regardless of whether it meets the definition of "natural flavor." *See* 21 C.F.R. § 101.22(a)(3).

67.    The labeling for added vanillin is controlled by the vanilla standards as opposed to the general flavoring regulations, wherever there is a conflict between them.

68.    The vanilla regulations require that wherever real vanilla is used together with vanillin, it is required to be designated on the ingredient list and "followed immediately by the statement 'contains vanillin, an artificial flavor (or flavoring).'" *See* Vanilla-vanillin extract at 21 C.F.R. §§ 169.180(b).[22]

69.    These requirements were established to prevent consumers from being misled by products which "spike" a miniscule amount of real vanilla with vanillin.

70.    The front label of a product with added vanillin is required to disclose this material fact by the designation "Artificially Flavored Vanilla Almondmilk." *See* 21 C.F.R. § 101.22(i)(2) ("If the food contains any artificial flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel…shall be accompanied by the word(s) 'artificial' or 'artificially flavored'").

VI.    Vanilla Almondmilk Products are Misleading Because They are Labeled and Named Similar to Other Products

71.    Competitor brands to defendant's Products are labeled as or containing vanilla , and are not misleading because they only contain flavoring derived from vanilla.

A.    Vanilla Almondmilk Product of Competitor and Defendant

72.    The following is an example of a Vanilla Bean Ice Cream Product of defendant and a competitor product.

---

[22] *See also* 21 C.F.R. § 169.181(b), § 169.182(b) (similar declarations required for Vanilla-vanillin flavoring and Vanilla-vanillin powder).

| Competitor Product | Product |
| --- | --- |
|  |  |

**INGREDIENTS:** Organic Almond Base (Filtered Water, Organic Almonds), Organic Vanilla Flavor, Sea Salt, Sunflower Lecithin, Organic Locust Bean Gum, Gellan Gum, Vitamin A Palmitate, Ergocalciferol (Vitamin D2), DL-Alpha-Tocopheryl Acetate (Vitamin E), Riboflavin (Vitamin B2), Zinc Gluconate, Cyanocobalamin (Vitamin B12).

**INGREDIENTS:** ALMONDMILK (FILTERED WATER, ALMONDS), CALCIUM CARBONATE, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, POTASSIUM CITRATE, SUNFLOWER LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E).

INGREDIENTS: Organic Almond Base (Filtered Water, Organic Almonds), Organic Vanilla Flavor, Sea Salt, Sunflower Lecithin, Organic Locust Bean Gum, Gellan Gum, Vitamin A Palmitate, Ergocalciferol (Vitamin D2), Dl-Alpha-Tocopheryl Acetate (Vitamin

INGREDIENTS: ALMONDMILK (FILTERED WATER, ALMONDS), CALCIUM CARBONATE, NATURAL VANILLA FLAVOR WITH OTHER NATURAL FLAVORS, SEA SALT, POTASSIUM CITRATE, SUNFLOWER

16

| E), Riboflavin (Vitamin B2), Zinc Gluconate, Cyanocobalamin (Vitamin B12). | LECITHIN, GELLAN GUM, VITAMIN A PALMITATE, VITAMIN D2, D-ALPHA-TOCOPHEROL (NATURAL VITAMIN E). |
|---|---|

73.    The competitor product lists "Organic Vanilla Flavor" on its ingredient list as opposed to "Natural Vanilla Flavor With Other Natural Flavor."

**B.    Misleading to Have Identical or Similar Product Names Where Significant Differences in Product Quality or Composition**

74.    Product names are established through application of the relevant regulations.

75.    Products are required to be identified and labeled in a way consistent with other products of similar composition.

76.    This framework assures consumers will not be misled by the quality and components of similarly labeled products where one product contains a greater amount, type and/or proportion of a characterizing and valuable ingredient.[23]

77.    Where two products are identified by the same descriptive terms and noun such as "Vanilla Almondmilk," consumers will be deceived into purchasing the product which contains less of the valuable ingredients under the false impression that it contains the equivalent amount of said ingredients or components.

78.    Defendant's Product is misleading because it is represented as identical to another product which contains more, and a greater percentage, of the valuable ingredients, which causes consumers to be misled.

**VII.    Conclusion**

---

[23] *See* 21 C.F.R. § 135.110(f) and 21 C.F.R. § 102.5(a) ("General principles.") ("General principles.") ("The name shall be uniform among all identical or similar products and may not be confusingly similar to the name of any other food that is not reasonably encompassed within the same name. Each class or subclass of food shall be given its own common or usual name that states, in clear terms, what it is in a way that distinguishes it from different foods.").

79.     The proportion of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Product because it is more expensive and desired.

80.     The representations are misleading because the Product does not contain the amount, type and/or percentage of vanilla as a component of its flavoring, which is required by law and consistent with consumer expectations.

81.     Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

82.     The Product contains other representations which are misleading and deceptive.

83.     As a result of the false and misleading labeling, the Product is sold at a premium price of approximately $4.49 per 64 FL OZ, excluding tax – compared to other similar products represented in a non-misleading way.

Jurisdiction and Venue

84.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

85.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

86.     Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

87.     This is a reasonable assumption because the Products are sold in defendant's 132 stores across numerous states and have been sold in similar or identical manner for several years.

88.     Plaintiff Constance Fore-Heron is a citizen of New York.

89.     Defendant The Price Chopper, Inc. is a New York corporation with a principal place

of business in Schenectady, Schenectady County, New York.

90.     Defendant is a citizen of New York because it is incorporated in New York and has its principal place of business in New York. *Andrews v. Citimortgage, Inc.*, No. 14-cv-1534 (JS)(AKT) (E.D.N.Y. Mar. 31, 2015) ("[a] corporation has dual citizenship for purposes of a federal court's diversity jurisdiction under 28 U.S.C. § 1332; namely, it is a citizen of the state of its incorporation and of the state where it has its principal place of business.").

91.     "Minimal diversity" exists because even though the parties are both citizens of this state, plaintiff seeks to represent persons in all states who purchased the Products. *Gonzales v. Agway Energy Services, LLC*, No. 18-cv-235 (N.D.N.Y. Oct. 22, 2018) ("At this time, the allegation that some class member maintains diversity with Defendant is sufficient to establish minimal diversity under CAFA" and citing 28 U.S.C. § 1332(d)(1)(D) "'the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.").

92.     Defendant's stores are located in New York, Connecticut, Massachusetts, Vermont, New Hampshire, Pennsylvania and Rhode Island.

93.     Certain exceptions preclude diversity jurisdiction. 28 U.S.C. § 1332(d)(4).

94.     The "local controversy" exception does not apply because less than two-thirds of the putative class members are citizens of New York.

95.     Under the "local controversy" exception, a district court must decline jurisdiction if "(1) more than two-thirds of the putative class members are citizens of the state in which the action was originally filed; (2) there is at least one defendant from whom `significant relief' is sought by the class members, whose alleged conduct forms a `significant basis' for the asserted claims, and who is a citizen of the state in which the action was originally filed; (3) the principal injuries

suffered by the class were incurred in the state in which the action was originally filed; and (4) no other class action asserting the same or similar factual allegations has been filed against any of the defendants within the past three years." *Green v. Sweetworks Confections, LLC*, No. 18-cv-902 S.D.N.Y. Aug. 21, 2019) quoting 28 U.S.C. § 1332(d)(4)(A).

96.    At bar, the "local controversy" exception is not satisfied because less than two-thirds of proposed class members are citizens of New York.

97.    This fact can plausibly be alleged because defendant has no fewer than 132 stores in New York, Connecticut, Massachusetts, Vermont, New Hampshire, Pennsylvania and Rhode Island.

98.    Thirty (30) of defendant's stores are located in New York and the other ninety-two (92) are in states other than New York.

99.    For more than two-thirds of class members to be citizens of New York, defendant's would need to get two-thirds (66.6%) of its customers from New York, even though its stores in New York comprise less than 25% of its total stores.

100.    Additionally, the entire Upstate region of New York contains 8.5 million people.

101.    The states where it has the majority of its stores are also more densely populated than Upstate New York.

102.    For the local controversy exception to apply, defendant would need to receive more than two-thirds of its customers from a state that contains less than 25% of its stores and is home to a customer base that is no greater than 25% of all possible customers across the other states.

103.    Under the "home state controversy" exception to CAFA, a district court "shall decline to exercise jurisdiction" if "two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action

was originally filed." 28 U.S.C. § 1332(d)(4)(B).

104.  For the same reasons that the local controversy exception does not apply, the home state controversy does not apply.

105.  This is because less than two-thirds of the members of all proposed plaintiff classes are citizens of New York. 28 U.S.C. § 1332(d)(4)(B).

106.  This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to supply and supplies goods within New York.

107.  Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

108.  A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

109.  Plaintiff Constance Fore-Heron is a citizen of Sullivan County, New York.

110.  Defendant The Price Chopper, Inc.  is a New York corporation with a principal place of business in Schenectady, Schenectady County, New York.

111.  During the class period, plaintiff purchased one or more of the Product identified herein, in his or her district and/or state, for personal use, consumption or application based on the above representations, for no less than the price indicated, *supra*, excluding tax,

112.  Plaintiff would consider purchasing the Product again if there were assurances that the Product's representations were no longer misleading.

Class Allegations

113.  The classes will consist of all consumers in New York and the other 49 states and a nationwide class where applicable.

114. Common questions of law or fact predominate and include whether the representations were likely to deceive reasonable consumers and if plaintiff and class members are entitled to damages.

115. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same representations.

116. Plaintiff is an adequate representative because his or her interests do not conflict with other members.

117. No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

118. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest.

119. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

120. Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York General Business Law ("GBL") §§ 349 & 350</u>

121. Plaintiff asserts causes of action under the consumer protection statutes of New York, General Business Law ("GBL") §§ 349 & 350.

122. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

123. Plaintiff and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

124. Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

125. Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair

because it gives the impression to consumers the Products contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and only contain said ingredient to flavor the Product.

<u>Breaches of Express Warranty, Implied Warranty of Merchantability and<br>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*</u>

126.  Plaintiff incorporates by reference all preceding paragraphs.

127.  Defendant manufactures and sells products which purport to contain sufficient amounts of the highlighted ingredient, vanilla, to characterize the taste or flavor of the Products and only contained the highlighted ingredient to flavor the Product, which is desired by consumers.

128.  The Product warranted to Plaintiff and class members that it possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which it did not due to the amount and/or type of the aforementioned ingredient.

129.  Defendant had a duty to disclose and/or provide a non-deceptive description and identification of the Product and its ingredients.

130.  This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

131.  Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

132.  The Product did not conform to its affirmations of fact and promises due to defendant's actions and were not merchantable.

133.  Plaintiff and class members relied on defendant's claims, paying more than they would have.

<u>Fraud</u>

134.  Plaintiff incorporates by references all preceding paragraphs.

135. Defendant's purpose was to sell a product which purported to contain valuable and desired characterizing ingredients and/or flavors, and represent the Products were exclusively flavored by the designated ingredients and contained sufficient independent amounts of same.

136. Defendant's fraudulent intent is evinced by its failure to accurately indicate the Products contained less of the desired ingredient or none at all.

137. Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

Unjust Enrichment

138. Plaintiff incorporates by reference all preceding paragraphs.

139. Defendant obtained benefits and monies because the Product were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove and/or refrain from the challenged representations, restitution and disgorgement for members of the State Subclasses pursuant to the consumer protection laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and consumer protection law claims, and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   December 6, 2019

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

7:19-cv-11224
United States District Court
Southern District of New York

Constance Fore-Heron, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

The Price Chopper, Inc.,

Defendant

## Class Action Complaint

```
Sheehan & Associates, P.C.
505 Northern Blvd., #311
  Great Neck, NY 11021
  Tel: (516) 303-0552
  Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated:  December 6, 2019

/s/ Spencer Sheehan
Spencer Sheehan